UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JONATHAN BROWN,

       Plaintiff,

                                  Case No. 10-12162

v.                               Honorable Thomas L. Ludington

CITY OF DETROIT,

       Defendant.

_____ /

**OPINION AND ORDER GRANTING IN PART AND DENYING
IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND
ORDERING SUPPLEMENTAL BRIEFING ON ISSUES GOVERNING LIABILITY**

In June 2012, the Supreme Court granted a writ of certiorari on "Whether a district court may certify a class action without resolving whether the plaintiff class has introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis." *Behrend v. Comcast Corp.*, 655 F.3d 182 (3d Cir. 2011), *cert. granted sub nom. Comcast Corp. v. Behrend*, 80 U.S.L.W. 3442 (U.S. Jun 25, 2012) (No. 11-864).

This case raises a related question — specifically, whether liability may be bifurcated from damages in a class action brought pursuant to Federal Rule of Civil Procedure 23(b)(3). Sixth Circuit precedent authorizes the bifurcation of liability from damages in class actions brought pursuant to Rule 23(b)(3). *E.g.*, *Olden v. LaFarge Corp.*, 203 F.R.D. 254 (E.D. Mich. 2001) (Lawson, J.), *aff'd* 383 F.3d 495 (6th Cir. 2004); *see also* Fed. R. Civ. P. (c)(4) ("When appropriate, an action may be brought or maintained as a class action with respect to particular issues."). Accordingly, the question presented is answered in the affirmative.

The case arises out of the manner that Defendant City of Detroit allegedly treats those arrested within the city. Plaintiff Jonathan Aaron Brown, asserting § 1983 claims individually

and on behalf of tens of thousands of others, filed suit alleging that Defendant routinely violates the constitutional rights of arrestees three distinct ways. First, Defendant does not provide bedding when an arrestee is detained overnight or for more than sixteen hours. Second, Defendant regularly detains arrestees for more than forty-eight hours without a judicial determination of probable cause. And third, Defendant does not feed arrestees at least two meals a day. Plaintiff estimates the size of the proposed "Class I" is about 108,000. "Class II" is about 30,000. And Class III, Plaintiff acknowledges, has not been determined.

Plaintiff filed this suit in June 2010. Over the next several months Defendant did not respond to discovery demands, notwithstanding two court orders compelling their production. Accordingly, in April 2011 the Court entered an order of default against Defendant. ECF No. 27. Since then, the parties have filed two rounds of supplemental briefing on whether damages and liability may be bifurcated, whether class certification is appropriate, and whether the default runs to the putative classes or is limited to Plaintiff's individual claims.

As detailed below, the first two proposed classes will be certified. The third will not be. Damages and liability will be bifurcated. Default will run to the putative classes. And supplemental briefing will be ordered on whether the allegations in the complaint for the first two classes state a valid cause of action.

Briefly, once liability is bifurcated from damages, establishing Defendants' liability does not merely involve common questions of fact and law for the first two proposed classes — it depends on them. To establish municipal liability under "inaction theory," the first element Plaintiff must prove is "the existence of a clear and persistent pattern of violating federal rights." *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F. 3d 592, 607 (6th Cir. 2007).

Consequently, the individual facts particular to each member's claim are the material facts essential to the claim common to all.

Moreover, the Supreme Court instructs that the primary purpose of class actions is the "vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (internal quotation marks omitted) (quoting Benjamin Kaplan, *A Prefatory Note*, 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969)). "The policy at the very core of the class action mechanism," the Court explains, "is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Amchem*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (1997)). This case thus presents a quintessential case for class action, the accusation of a serious, ongoing problem that is unlikely to be remedied by an individual plaintiff because of the relatively modest damages.

The Court will certify the first two classes as to liability. But as Plaintiff has not provided sufficient detail regarding the third proposed class, the Court will decline to certify the class at this time.

Additionally, the Court will order supplemental briefing on the issue of whether the allegations in the complaint for the first two classes state a valid cause of action. "The effect of a default," as a matter of the black letter law, "is to deem admitted all the well-pleaded facts in the complaint." 49 C.J.S. *Judgments* § 273 (2012). A default does not, however, deem admitted legal conclusions. *Id.* Here, when default was entered in April 2011, its scope extended to "all the well-pleaded facts in the complaint." *Id.* And the factual allegations in the complaint are not

limited to Plaintiff.  They extend to the three proposed classes as well.  The scope of the default thus extends to these classes.  This does not mean, however, that Defendant is liable to each of the three classes.  Defendant may still challenge the legal conclusions in the complaint, such as the allegation that depriving bedding to an arrestee held for sixteen hours constitutes a constitutional tort.  Accordingly, before deciding Defendant's liability, the Court will direct the parties to brief the legal issues pertinent to the first two classes.

## I

## A

On June 1, 2010, Plaintiff filed a complaint in this Court.  The complaint asserts that Plaintiff was arrested by the Detroit Police Department at 10:00 a.m. on September 21, 2007, and detained in a cold, isolated holding cell without proper food, blankets, or a pillow for fifty-five hours before being arraigned.  The complaint further alleges that Defendant has treated tens of thousands of other arrestees in a similar manner since May 2007.  Accordingly, the complaint seeks class certification for three classes of persons.

Class I is defined in the complaint as "All persons detained in a [Detroit Police Department] lock-up or detective division facility overnight or for more than sixteen hours in a 24-hour period at any time from May 27, 2007 to the present."  Compl. ¶ 38.  The complaint contends that these arrestees were subjected to "inhumane conditions of confinement" as Defendant "maintains no bedding and no facilities to allow arrestees to get meaningful sleep, i.e., no beds, cots, mattresses, blankets or pillows."  *Id*. ¶ 38(d); *see id*. ¶¶ 17–23.

Class II is defined as "All persons detained by the DPD in excess of 48 hours without a judicial determination of probable cause at anytime from May 27, 2007 until the present."  *Id*. ¶ 43.  As noted, the complaint alleges that Defendant has "an ingrained and long standing practice

of detaining arrestees for more than forty-eight hours without a judicial determination of probable cause." *Id*. ¶ 44(e). The complaint further asserts: "An analysis of the sample data obtained by the consent decree monitor indicates that during the reporting periods in 2008 and 2009, between 18 and 34 percent of arrestees were detained in excess of 48 hours by the [Detroit Police Department] without a judicial determination of probable cause." *Id*. ¶ 44(f).

Elaborating on the basis for certification of this class, paragraph 46 identifies four "questions of law and fact common to the claims of Class II." The first is "Whether it violates the constitution to detain arrestees in excess of 48 hours without obtaining judicial approval of probable cause for the detention." Compl. ¶ 46(a). The second is "Whether it violates state law to detain arrestees in excess of 48 hours without obtaining judicial approval of probable cause for the detention." *Id*. ¶ 46(b). The third is "Whether the [Detroit Police Department] maintained a policy, custom and/or widespread practice allowing the detention of arrestees in excess of 48 hours without obtaining a judicial determination of probable cause for the detention." *Id*. ¶ 46(c). And the fourth is "Whether [department] officials have been deliberately indifferent to the need for training, enforcement, discipline, and/or better policies regarding the length of detention of arrestees in the absence of a judicial determination of probable cause." *Id*. ¶ 46(d).

Class III is defined in the complaint as "All persons detained by the [City of Detroit Police Department] in excess of 24 hours [who] did not receive at least two meals at any time from May 27, 2007 to the present." *Id*. ¶ 50. Paragraph 51 elaborates: "The [department] maintains or maintained a policy, custom and/or widespread practice permitting officers to detain citizens in excess of 24 hours without feeding them."

**B**

Defendant was served and timely answered in June 2010. ECF Nos. 10, 11. In August 2010, the Court entered a scheduling order. ECF No. 13. It set deadlines for discovery and dispositive motions. It also scheduled the pretrial conference and trial. In September 2010, Plaintiff moved to compel discovery responses. ECF No. 14. Plaintiff explained that he had requested a database of all persons arrested by the Detroit Police Department during the class period. Defendant produced a four-page document regarding Plaintiff's arrest, nothing else. Plaintiff's motion to compel was granted. ECF No. 18. Still, Defendant did not respond to the discovery requests. In November 2010, Plaintiff moved to enforce the order granting Plaintiff's motion to compel. ECF No. 19. The following month, a stipulated order was entered granting Plaintiff's motion. ECF No. 24.

Again, Defendant did not produce the discovery as ordered. In March 2011, Plaintiff moved for sanctions. ECF No. 25. On April 18, 2011, the Court — noting that there had been nine months of unexplained agreements to produce voluminous documents followed by neglect and inattention by Defendant — granted Plaintiff's motion and entered a default against Defendant. ECF No. 27. In entering the order, the Court emphasized that Defendant repeatedly missed discovery deadlines agreed to by the parties and ignored the Court's orders. Indeed, by the time the Court entered the default, Defendant had stopped speaking to Plaintiff's attorneys, responding to Plaintiff's written inquiries, and appearing for Court-ordered hearings.

The day after the default was entered, Defendant moved to set it aside. ECF No. 29. The Court, finding that Defendant had not demonstrated good cause for setting aside the default, denied the motion in May 2011. ECF No. 33. The Court noted, however, that the default was as

to liability only.  Whether class certification is appropriate in this case, the Court observed, was not resolved by the default.

<div align="center">C</div>

To begin to focus attention on whether class certification is appropriate, on May 31, 2011, the Court held a status conference.  Following the conference, an order was entered setting a briefing schedule on two issues.  ECF No. 38.  First, Defendant was directed to brief all of the reasons it believes that the detention of some persons for more than forty-eight hours following their arrests without a judicial determination of probable cause complied with the Fourth Amendment as interpreted by *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), and progeny.  Plaintiff was directed to respond and to brief the interplay between municipal liability under 42 U.S.C. § 1983 (as defined in *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and progeny) and Plaintiff's burden under Rule 23 of demonstrating that class certification is appropriate.

Defendant timely filed a brief identifying several exceptions to the forty-eight  hour presumption established by *McLaughlin*, including: (1) "terrorist acts (or bomb threats)"; (2) "extreme weather (floods, snow storms, etc.)"; (3) "power outage"; (4) "illness of detainee"; (5) "mental state of detainee (unable to understand process)"; and (6) "false I.D. given by detainee." Def.'s Mem. on Permissible Exceptions 3, ECF No. 39.

Plaintiff then filed a response brief.  ECF No. 44.  He asserted that "none of these defenses, even if legally valid, would defeat Rule 23(b)(3) class certification because each of them can be handled ministerially."  Pl.'s Resp. to Def.'s Mem. on Permissible Exceptions 2, ECF No. 44.  Illustrating the argument, Plaintiff explained: "Take, for example, an arrestee's illness — a matter that may constitute an 'extraordinary circumstance' under *McLaughlin*.  If an

<div align="center">-7-</div>

arrestee is sick while in custody, the Department checks a box indicating so on the arrest report at the time of booking.  Because there is an arrest report for each detainee, parties can determine the universe of people to whom this circumstance even arguably applies." *Id*.  If there are only a handful of class members fitting within this exception, Plaintiff elaborated, "then these individualized determinations would not predominate over the common determination of the City's *Monell* liability for holding class members longer than 48-hours." *Id*.

Turning to the interplay between municipal liability under *Monell* and class certification, Plaintiff asserted that "it has become well-accepted that the common factual questions in proving a *Monell* claim usually predominate.  As a result, courts generally certify *Monell* claims for class treatment even when there may be some individualized defenses." *Id*. at 3 (citing *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F. 3d 592, 619 (6th Cir. 2007)).  Plaintiff further noted that in two cases, district courts certified Rule 23(b)(3) class actions based on a municipality's policy of not arraigning or releasing arrestees within forty-eight hours.  Pl.'s Resp. 4 (citing *Strunk v. LaGrange Cnty. Sheriff*, No. 10-CV-23, 2011 WL 839662, at *1 (N.D. Ind. March 7, 2011); and *Dunn v. City of Chicago*, 231 F.R.D. 367, 375 (N.D. Ill. Oct. 5, 2005)).

Defendant timely filed a reply memorandum.  ECF No. 46.  "It is not clear what Plaintiff means by 'handled ministerially,'" Defendant wrote, elaborating: "It is clear that with respect to the legal defenses available regarding each putative class member there are several questions of fact on the liability issues, as well as numerous individual damage questions of fact.  The unique nature of each member[']s case means that these claims cannot be handled on a class basis." Def.'s Reply to Pl.'s Resp. 2.  Defendant concluded: "The simple truth is that in the Sixth Circuit *Monell* civil rights litigation is not normally certified under Rule 23(b)(3) because of the

'predominance' requirement of that rule, which requires that common questions of law and fact 'predominate' over individual ones." *Id*. at 9.

## D

In November 2011, a status conference was held.  Shortly before the conference, Plaintiff submitted a status report on the potential size of the three proposed classes.  ECF No. 53. Plaintiff estimated the size of Class I is about 108,000, Class II is about 30,000, and Class III had not been determined.

To calculate the size of the classes, Plaintiff explained, he reviewed three of Defendant's databases: LiveScan, Crisnet, and the warrant tracking form database.  LiveScan contains "uniform fields of information for all person[s] that the [Detroit Police Department] arrests, including biographical and arrest information.  From June 1, 2007 to July 31, 2011, the LiveScan database contains 142,143 valid records."  Pl.'s Report on Potential Size of Class 1, ECF No. 53. Crisnet contains information for all persons the department "encounters," and, if the encounter results in an arrest, "the record contains a detailed description of the events that transpired, including whether a warrant was issued prior to the arrest. . . .  From June 1, 2007 to July 31, 2011, the Crisnet database contains 298,399 records."  *Id*. at 2–3.  The warrant tracking form database, which contains "the only evidence the [Detroit Police Department] maintains as to why an individual did not get to see a judge for more than 48 hours after arrest," has just 4,173 records.  *Id*. at 3.  Plaintiff specified that he found:

- For Class I, Defendant's databases contained "107,609 records where an individual was detained between 10 p.m. and 6 a.m. or for more than 16 hours."

- For Class II, Defendant's databases showed "there were 37,064 arrests which lead to detentions longer than 48 hours. . . .  Of the 37,064 arrests where the length of detention exceeded 48 hours, 79.4% were warrantless arrests.  The estimated size for Class II is 29,431."

- For Class III, Defendant did not maintain an electronic record, and so Plaintiff had not yet determined the size of the potential class. Plaintiff explained: "The meal logs are only available in paper format and have not been data entered electronically yet. As such, this analysis is limited to the length of detention criteria and the estimated class size is overly inclusive. With that understanding, the LiveScan database identifies 83,808 records where an arrestee was detained over 24 hours."

Pl.'s Report on Potential Size of Class 2, 3, 4–5, ECF No. 53.

Plaintiff also elaborated regarding Defendant's affirmative defenses to Class II. Plaintiff first noted that the warrant tracking form database ( "the only evidence the DPD maintains as to why an individual did not get to see a judge for more than 48 hours after arrest") contained 4,173 records. *Id*. at 3. After reviewing 30 percent of these records, Plaintiff extrapolated that for the potential class of about 30,000 "there are likely to be only 200 records at issue." *Id*. at 4.

In February 2012, another status conference was held. Plaintiff again submitted a status report. ECF No. 55. Plaintiff explained that he had had significantly overestimated the number of Class II members for whom Defendant had an affirmative defense. "After reviewing the relevant records from the Warrant Tracking Form database," Plaintiff elaborated, "[he] identified a total of 110 records which fit in one of Defendant's affirmative defenses." Pl.'s Report on Number of Individuals Affected by Affirmative Defenses 2, ECF No. 55. Thus, Defendant had affirmative defenses for less than 0.5 percent of the potential Class II members.

Acknowledging that Defendant disagreed regarding whether the 110 records form a complete list of potential class members subject to an affirmative defense, Plaintiff continued: "Defendant has no good-faith basis to take this position. First, the City has made no showing that any other evidence exists. Second, the Defendant, through its Rule 30(b)(6) representative, admitted that when an exigent circumstance exists to justify the judicial review violation, it is always documented on a Warrant Tracking Form." *Id*. (citing Romeo Dep. 97:3–7, Sept. 29,

2012).  Additionally, Plaintiff reiterated his assertion that the proffered affirmative defenses do not "overshadow" the common factual and legal questions for Class II: "Each putative class member seeks recovery under the same legal theories and must prove the same policies and practices by the Defendant."  *Id*. at 4.

**E**

Following the status conference, an order was entered directing supplemental briefing on Plaintiff's pending motion for class certification and entry of default in favor of the class.

Plaintiff filed a supplemental brief in April 2012 asserting that Class II should be certified for "two independently sufficient reasons.  First, Defendant forfeited any *Riverside* justification defense by incurring the default.  And, second, even if the Court did allow Defendant to assert a *Riverside* defense, the defense involves only a handful of categorical justifications, which can be excluded from the class definition."  Pl.'s Supp. Mem. on Class Certification 3, ECF No. 57 (internal citations omitted).  Elaborating on the first argument, Plaintiff wrote: "Defendant delayed in discovery, violated court orders, and ultimately defaulted.  Its affirmative defenses are waived."  *Id*. at 8.

Addressing the scope of Defendant's default, Plaintiff asserted that because a default deems admitted all the factual allegations in the complaint, liability extends to the entire class.  "The order applied to the entire complaint," Plaintiff wrote, "which included the claims brought on behalf of the classes.  It did not parse the named Plaintiff from the claims he brought for himself and the absent class members."  *Id*. at 8–9.

Plaintiff further asserted that default as to liability is appropriate for the Class I claim because it states a valid cause of action.  Plaintiff wrote that "numerous courts have found that withholding bedding as a matter of course . . . violates the Fourteenth Amendment."  *Id*. at 11

(citing *Thompson v. City of L.A.*, 885 F.2d 1439 (9th Cir. 1989); *Anela v. City of Wildwood*, 790 F.2d 1063 (3d Cir. 1986)).  Likewise, Plaintiff continued, default as to liability is appropriate for Class II since "[a]ll the class needs to prove to meet their burden to establish a *Riverside* violation is the fact that they were held longer than 48-hours without judicial approval."  *Id*. at 12.  Finally, "Even less analysis is needed to establish the viability of Class III's claim."  *Id*. at 11.  By defaulting, "Defendant admits that it did not provide minimally adequate food to the persons meeting the definition of Class III."  *Id*. at 12.

Defendant responded on June 5, 2012.  ECF No. 58.  Defendant first argued that not only should the default not extend to the entire class, the default as to Plaintiff should be set aside.  Defendant wrote: "Plaintiff (who waited for three years before filing this suit) will not suffer significant prejudice by setting aside the default and continuing this litigation on the merits."  Def.'s Supp. Br. Opp'n to Class Certification 7, ECF No. 58.  Defendant continued: "The named Plaintiff cites no authority for the proposition that (there being no class certification) he has standing to pursue a default or default judgment or any other legal action on behalf of unidentified individuals who may or may not become class members . . . .  A default judgment on their behalf would also be inappropriate inasmuch as the reason for the default judgment (a failure to timely provide discovery) no longer exists and the future members of the class (if certified) have suffered no actual prejudice."  *Id*. at 10.

Turning to the class certification issue, Defendant asserted that Class II should not be certified because Plaintiff has not established commonality.  Specifically, Defendant asserted, "mini-trials would be necessary to determine (from actual testimony from both parties and not simply records) . . . what did and did not occur and why.  In addition to the subjective and individual damages allegedly suffered it would have to be determined in each excessive

detention, whether a policy existed which was the moving force behind said detention, or if that detention was simply a one out of 500 clerical or other isolate[d] error." *Id*. at 11.  In support, Defendant cited *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), and *Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003).

Two weeks later, Plaintiff replied.  ECF No. 59.  Defendant is not entitled to have the default set aside, Plaintiff wrote, because the request is time-barred under the Federal Rules of Civil Procedure.  Noting that the Court denied Defendant's request to set aside the default in May 2011, and Defendant's present request was made in June 2012, Plaintiff observed that "requests for relief under Rule 60(b)(1) must be presented within one year after the entry of the order."  Pl.'s Reply Supp. Mot. for Class Certification 2, ECF No. 59.

Addressing the class certification issue, Plaintiff argued Defendant's reliance on *Wal-Mart* and *Alkire* was misplaced.  Plaintiff argued that the Court rejected class certification in *Wal-Mart* because "there was no proof that *every* Wal-mart store in the nation operated under a common standard for promotions and new hires."  *Id*. at 5.  In contrast, Plaintiff continued, "the evidence in this case shows common practices applied throughout all police districts that result in the violation of the putative class members' constitutional rights.  For example, the warrant tracking form database shows that time and time again, regardless of district, warrantless arrestees are held over 48 hours without a probable cause hearing due to sloppy report writing." *Id*. at 5–6.

## II

Two primary issues are now before the Court.  First, is Plaintiff entitled to class certification?  And second, is Defendant in default as to the entire class?

These two questions must be addressed in this order because absent class certification, no default as to the (nonexistent) class can be made.  *Davis v. Hutchins*, 321 F.3d 641, 648–49 (7th Cir. 2003).  Notwithstanding the "the general principle that factual allegations in the complaint are deemed admitted by the defendant upon default," the Seventh Circuit observes: "Rule 23(c) imposes an independent duty on the district court to determine by order that the requirements of Rule 23(a) are met regardless of the defendant's admissions."  *Id*. at 648–49.  "Allowing certification by default or because the defendant has admitted that the class exists, with no independent analysis or determination by the district judge, would remove this important protection," the court further admonishes.  *Id*. at 649; *see also Partington v. Am. Int'l Specialty Lines Ins. Co.*, 443 F.3d 334, 341 (4th Cir. 2006) ("In addition, the Seventh Circuit — the only circuit to address the question of implicit certification in the context of a default judgment — refused to allow it.  We agree with its reasoning that although a default judgment has the effect of deeming all factual allegations in the complaint admitted, it does not also have the effect of "admitting" the independent legal question of class certification.").

Accordingly, the class certification issue is addressed first, the scope of the default second.

### A

Rule 23 requires a two-stage analysis for determining whether class certification is appropriate.  At stage (a), the plaintiff must establish four elements — numerosity, commonality, typicality, and adequacy of representation.  Subsection (a) of Rule 23 provides:

One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;

-14-

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a); *see generally Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 617 (6th Cir. 2007).

At stage (b), the plaintiff must satisfy the requirements of one of the types of class actions set forth in Rule 23(b). Here, Plaintiff moves for certification under the "predominance" subsection set forth in subsection (b)(3), which requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see generally Powers*, 501 F.3d at 617.

The analysis of a plaintiff's compliance with the requirements of Rule 23 is "rigorous." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "Rule 23," the Supreme Court instructs, "does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule — that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Id.* (emphasis in original). Moreover, a class can be certified "only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.* (citations and internal quotation marks omitted) (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 160 (1982)).

Here, Plaintiff seeks to have three classes certified. Each is addressed in turn.

**1**

Plaintiff first seeks to certify a class of about one hundred thousand people detained between 10 p.m. and 6 a.m. or for more than sixteen hours without bedding.  As this class satisfies the requirements of Rule 23(a) and (b)(3), the Court will certify it.

**a**

First, the class is sufficiently numerous to make joinder "impracticable."  Fed. R. Civ. P. 23(a)(1); *see generally* 32B Am. Jur. 2d Fed. Courts *When Joinder is Impracticable* § 1608 (2012).  Impracticability is not impossibility — rather, "class representatives must demonstrate only that 'common sense' suggests that it would be difficult or inconvenient to join all class members." *Varacallo v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 207, 229 (D.N.J. 2005) (quoting *In re the Prudential Ins. Co. of Am.*, 962 F. Supp. 450, 495, 510 (D.N.J. 1997)); *see Beattie v. CenturyTel, Inc.*, 234 F.R.D. 160, 168 (E.D. Mich. 2006) ("Where the exact size of the class is unknown but general knowledge and common sense indicate that it is large, the numerosity requirement is satisfied."), *aff'd* 511 F.3d 554 (6th Cir. 2007).

"There is no specific number below which class action relief is automatically precluded," the Sixth Circuit notes, elaborating: "Impracticability of joinder is not determined according to a strict numerical test but upon the circumstances surrounding the case." *Senter v. Gen. Motors Corp.*, 532 F2d 511, 523 n.24 (1976); *cf. Flood v. Dominguez*, 270 F.R.D. 413, 417(N.D. Ind. 2010) ("Generally speaking, when the putative class consists of more than 40 members, numerosity is met, but there is nothing magical about that number.").  Common sense suggests that the joinder of more than a hundred thousand people is not practicable.

**b**

Second, the class shares common issues of fact and law.  Commonality, as noted, requires a plaintiff demonstrate that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  "That language is easy to misread," the Supreme Court cautions, "since any competently crafted class complaint literally raises common questions."  *Wal-Mart*, 131 S. Ct. at 2551 (internal alterations and quotation marks omitted) (quoting Richard Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 131–132 (2009)).  In *Wal-Mart*, for example, ostensibly common questions included "Do all of us plaintiffs indeed work for Wal-Mart?  Do our managers have discretion over pay?  Is that an unlawful employment practice?"  *Id*.  These types of questions were insufficient, the Court observed, as commonality does not mean that the class members "have all suffered a violation of the same provision of law," but that they "have suffered the same injury."  *Id*. (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 (1982)).  Put differently, the common issue must involve — indeed, in fact resolve — an essential element of the class members' claim:

> Their claims must depend upon a common contention — for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Wal-Mart*, 131 S. Ct. at 2551.  The Sixth Circuit similarly notes: "Cases alleging a single course of wrongful conduct are particularly well-suited to class certification."  *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)).

In *Wal-Mart*, the plaintiffs sought to certify a class action on behalf of all Wal-Mart's female employees alleging a "pattern or practice" of sex discrimination in violation of Title VII.

The theory of the case was "that a strong and uniform 'corporate culture' permits bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers."  131 S. Ct. at 2548.  The Court concluded that the plaintiffs had not established commonality, explaining that "in resolving an individual's Title VII claim, the crux of the inquiry is 'the reason for a particular employment decision.'"  *Id*. at 2252 (quoting *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 876 (1984)).  The plaintiffs, however, had no common contention that would "produce a common answer to the crucial question *why was I disfavored*."  *Wal-Mart*, 131 S. Ct. at 2552 (emphasis in original).  Rejecting the plaintiffs' theory that the "social framework" of Wal-Mart rendered it "vulnerable to gender bias," the Court noted that the plaintiffs had no evidence regarding what percentage of the employment decisions were made because of "stereotyped thinking."  *Id*.  The plaintiffs' expert, for example, "conceded that he could not calculate whether 0.5 percent or 95 percent of the employment decisions at Wal-Mart might be determined by stereotyped thinking."  *Id*.  Thus, the Court held, the plaintiffs had not established a common pattern or practice.

In *Powers v. Hamilton County Public Defender Commission*, 501 F.3d 592 (6th Cir. 2007), in contrast, the Sixth Circuit upheld the class certification based on the allegation that the local public defender's office "had a well-settled custom or policy of not asking for an indigency hearing before a probationer is incarcerated for failure to pay a fine."  *Id*. at 598.  Specifically, the plaintiff produced evidence suggesting that "staff members of the Public Defender never ask for an indigency hearing" and, moreover, the defendant was unable to produce "any evidence showing that indigency hearings are ever requested."  *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, No. 1) 02-CV-00605, 2005 WL 2033696, at *5 (S.D. Ohio Aug. 23, 2005), *aff'd* 501

F.3d 592 (6th Cir. 2007).  The Sixth Circuit explained that the commonality requirement was met because the plaintiff alleged a "regular practice" causing constitutional injury:

> Powers has alleged that the Public Defender engaged in an ongoing and regular practice of failing to seek indigency hearings for criminal defendants facing incarceration for non-payment of fines.  Powers has asserted a single factual theory of wrongdoing and seeks to recover based on the single legal claim that the Public Defender's practice violated class members' due process rights.  The dispositive facts and law are the same as to each class member.  This is sufficient to satisfy both the commonality and predominance requirements.

*Id.* at 619 (citing *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988)).

In this case, Defendant does not dispute the fact that each member of the putative class was detained overnight or for more than sixteen hours without bedding.  The reason that they did not receive bedding, Defendant again acknowledges, is because Defendant "maintains no bedding and no facilities to allow arrestees to get meaningful sleep, i.e., no beds, cots, mattresses, blankets or pillows."  Compl. ¶ 38(d).

Legally, the question of whether this is a cognizable constitutional injury is the same for each of the putative class members.  As in *Powers*, the dispositive facts and law are the same as to each class member.[1]  Plaintiff has established the commonality required by Rule 23(a)(2).

**c**

Plaintiff has likewise established typicality required by Rule 23(a)(3).  Conceptually, typicality and commonality may be distinct.  As a practical matter, however, they "tend to merge."  *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 158 n.13 (1982); *see generally Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("The question of typicality in Rule 23(a)(3) is closely related to the preceding question of commonality.").

---

[1] This should not be interpreted to mean that Plaintiff is correct as a substantive matter that being detained overnight or for more than sixteen hours without bedding alleges a cognizable constitutional injury.  The substantive question is addressed in the discussion of the scope of the default.

The purpose of the requirement, the Court explains, is a screening mechanism "for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 158 n.13.

Here, Plaintiff's alleged constitutional injury is typical of the class: he was detained for a substantial period of time without bedding. Plaintiff has established the commonality required by Rule 23(a)(3).

### d

Finally, Plaintiff has established that he "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement again "tends to merge with the commonality and typicality criteria of Rule 23(a)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 626 n.20 (1997) (internal quotation mark omitted) (quoting *Falcon*, 457 U.S. at 158 n.13).

The purpose of the requirement, the Court explains, is "to uncover conflicts of interest between named parties and the class they seek to represent." *Id*. at 625 (citing *Falcon*, 457 U.S. at 157–58); *see generally* Charles Alan Wright, Arthur R. Miller, and Mary Kay Kane, *Federal Practice and Procedure* § 1768 (3d ed. 2005) ("It is axiomatic that a putative representative cannot adequately protect the class if his interests are antagonistic to or in conflict with the objectives of those he purports to represent."); Richard Posner, *Economic Analysis of Law* 586 (6th ed. 2003) (discussing incentives in class actions for the plaintiffs' counsel and the defendant). The Sixth Circuit therefore holds that "to satisfy the adequate representation requirements under Rule 23 . . . there must be an absence of a conflict of interest, and the

presence of common interests and injury." *Rutherford v. City of Cleveland*, 137 F.3d 905, 909 (6th Cir. 1998).

Here, there is no evidence a conflict of interest and, conversely, substantial evidence of vigorous prosecution.  Put simply, the incentives of the class members are aligned with each other and with Plaintiff's counsel: maximizing recovery.  Moreover, this is not the first large class action that counsel for Plaintiff has brought on behalf of arrestees.  *See, e.g.*, *Dunn v. City of Chicago*, 231 F.R.D. 367 (N.D. Ill. 2005).  Plaintiff has established the adequacy of representation required by Rule 23(a)(4).

**e**

Finally, the common questions pertinent to Class I "predominate over any questions affecting only individual members" and a class action is a superior vehicle "for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

To establish predominance, the plaintiff must demonstrate that "the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, predominate over those issues that are subject only to individualized proof."  *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 564 (6th Cir. 2007) (quotation marks omitted) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001)); *see generally* Wright, Miller, and Kane, *supra*, at § 1778 (observing "that it is not sufficient that common questions merely exist, as is true for purposes of Rule 23(a)(2), and that the court is under a duty to evaluate the relationship between the common and individual issues in all actions under Rule 23(b)(3)" (footnotes omitted)).

The Supreme Court explains that the "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods.,*

*Inc. v. Windsor*, 521 U.S. 591, 623 (1997).   In *Windsor*, the Court looked to the advisory committee notes for guidance regarding the requirement's purpose, finding: "the Advisory Committee had dominantly in mind vindication of the rights of groups of people who individually would be without effective strength to bring their opponents into court at all."   *Id*. at 617 (internal quotation marks omitted) (quoting Benjamin Kaplan, *A Prefatory Note*, 10 B.C. Ind. & Com. L. Rev. 497, 497 (1969)).

In this case, whether Defendant denies bedding to arrestees is subject to generalized proof.   Likewise, as Defendant concedes that the answer to this is a categorical "yes," whether this deprivation for those held overnight or for more than sixteen hours is a cognizable constitutional injury is likewise subject to generalized proof.

To elaborate on this second point, "in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word," the Supreme Court instructs, the court must evaluate whether the deprivation "is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose."   *Bell v. Wolfish*, 441 U.S. 520, 538 (1979) (citing *Flemming v. Nestor*, 363 U.S. 603, 613–17 (1960)).   The Court continues: "Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on whether an alternative purpose to which [the deprivation] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned to it."   *Wolfish*, 441 U.S. at 538 (internal alteration and quotation marks omitted) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963)).

In this case, because Defendant has a uniform policy of not providing bedding, evaluating what Defendant's purpose is and whether the deprivation is excessive in relation to that purpose is subject to generalized proof.

Moreover, the likely recoveries (small) do not provide a sufficient incentive for an individual to bring a solo action. A class action solves this problem by aggregating the relatively paltry potential recoveries into something of sufficient value to attract an attorney's services, while also providing an incentive for correcting a pattern of alleged constitutional violations. The Court will certify Class I.

**2**

Class II presents a somewhat closer question. Plaintiff seeks to certify a class of about 30,000 people detained for forty-eight hours or more without a judicial finding of probable cause. (This comprises about 20 percent of the total arrestees during the relevant period.[2]) Again, however, the Court will certify the class.

**a**

First, the class is sufficiently numerous to make joinder "impracticable." Fed. R. Civ. P. 23(a)(1). As detailed above, numerosity is not a bright-line rule, but a common sense standard. *Senter v. Gen. Motors Corp.*, 532 F2d 511, 523 n.24 (1976). Joining nearly thirty thousand persons may not be impossible, but it is certainly impracticable. Plaintiff has established the numerosity required by Rule 23(a)(1).

---

[2] From June 1, 2007 to July 31, 2011, Plaintiff reports, the Detroit Police Department made 142,143 arrests (an atypic figure for a city of 700,000). Of the 37,064 arrests where the length of detention exceeded 48 hours, 79.4 percent were warrantless arrests. After excluding the 100 for which a *Riverside* defense applied, the estimated size for Class II is 29,300.

**b**

Second, Plaintiff has established the commonality required by Rule 23(a)(2).  To establish municipal liability under an "inaction theory," the first element that a plaintiff must prove is "the existence of a clear and persistent pattern of violating federal rights."  *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007).  Plaintiff not only can, but must, point to a common contention to produce a common answer to this question: about 20 percent of the total warrantless detentions resulted in constitutional violations.

Consequently, this case is the analytical flipside of *Wal-Mart*.  There, the class members had to each individually "answer the crucial question *why was I disfavored*."  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2552 (2011) (emphasis in original).  Class certification was inappropriate because they had no common answer to this common question.  Here, the crucial question is whether Defendant had a "clear and persistent pattern of violating federal rights."  *Powers*, 501 F.3d at 607.  The focus is not the individual violation ("why was I disfavored?"), but the pattern of violations.  Thus, unlike in *Wal-Mart*, the dispositive facts and law are common to the class.  Plaintiff has established the commonality required by Rule 23(a)(2).

Reinforcing this conclusion are the decisions of the district courts in Illinois and Indiana.  In *Dunn v. City of Chicago*, 231 F.R.D. 367 (N.D. Ill. 2005), the plaintiffs' claim focused on a "well-established and widespread practice within the [Chicago Police Department] of using unlawfully long detentions."  *Id*. at 375.  Defendant opposed class certification, asserting "the case law establishes valid exceptions to the 48 hour rule, and thus it may have other defenses to some class members' claims."  *Id*.  Concluding common questions were not only present, but predominated, the court explained:

> As plaintiffs point out, such an exception is inherently unusual, and thus would
> apply to no more than a handful of identifiable class members.  In other words,

> the common predominant issues cannot be ignored in favor of the existence of a handful of extraordinary circumstances. . . . Moreover, the existence of individualized defenses does not preclude class certification. . . . Indeed, [*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991)] was a class action.

*Id.* at 375–76 (footnote and citations omitted).

Likewise, in *Strunk v. LaGrange County Sherriff*, No. 1:10-cv-23, 2011 WL 839662 (N.D. Ind. Mar. 7, 2011), the court concluded that common questions predominated. The plaintiffs alleged that 239 of the 261 arrestees during the relevant period were detained for more than forty-eight hours. "The primary, and likely dispositive issue involved in this case," the court wrote, "the constitutionality of the jail's detention length prior to an arraignment, are common to all LaGrange County Jail detainees arrested without a warrant — the potential class members. To win on the merits, each class member would have to advance the same legal theory." *Id.* at 4. Like the plaintiffs in *Dunn* and *Strunk*, in this case Plaintiff has established commonality.

Opposing this conclusion, Defendant relies on two cases, *Wal-Mart* and *Alkire v. Irving*, 330 F.3d 802 (6th Cir. 2003). For the reasons discussed above, *Wal-Mart* is inapposite. *Alkire*, while relevant, does not support the weight Defendant attempts to assign to it. The case involved an attempt to certify a class of persons "incarcerated due to failure to pay a civil debt or court costs." *Id.* at 820. The district court denied certification based on numerosity, explaining that although the plaintiff alleged hundreds of potential plaintiffs, a "search of jail records produced only nine potential class members." *Id.* In the alternative, the district court concluded that the common questions would not "predominate" under stage two of the class certification analysis because "the varying reasons for the arrests, varying lengths of stay in jail, varying financial situations, varying reasons for contempt adjudications would [too greatly] impact on the amount of damages any individual class member might be entitled to." *Id.* (internal alteration omitted).

The Sixth Circuit succinctly affirmed the judgment of the district court, writing: "The district court neither applied the wrong legal standard in examining these two elements, nor did it misapply the correct legal standard." *Id*. at 821.  In this case, as noted, Plaintiff satisfies the numerosity requirement.  The predominance requirement (as a general matter and as it relates to damages in particular) is discussed below.  And while the Sixth Circuit's discussion *Alkire* informs this Court's predominance analysis, that case does not support the proposition that this case lacks a common question of law or fact.  For Class II, Plaintiff has established the commonality required by Rule 23(a)(2).

<div align="center">c</div>

Plaintiff has likewise established the typicality required by Rule 23(a)(3).  As noted, the inquiry into typicality and commonality "tend to merge." *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 158 n.13 (1982).  Here, Plaintiff alleges that he — like each of the roughly 30,000 members of Class II — was detained for more than forty-eight hours without a judicial determination of probable cause and without extraordinary circumstances meriting the extended detention.  Because his claim is typical of the class, he has established the typicality required by Rule 23(a)(3).

<div align="center">d</div>

Plaintiff has also established, for reasons discussed above, that he "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  There is no evidence a conflict of interest and, conversely, substantial evidence of vigorous prosecution.  As with Class I, the incentives of the members of Class II are aligned with each other and with Plaintiff's counsel: maximizing recovery.  Plaintiff has established the commonality required by Rule 23(a)(4).

**e**

Finally, although a closer question, Plaintiff has also established that the common questions pertinent to Class I "predominate over any questions affecting only individual members" and a class action is a superior vehicle "for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The question is closer because, although for liability the common questions necessarily predominate over those affecting only individual members, the damages questions do not. Liability depends on Defendant engaging in a pattern of deliberate inaction — a pattern common to all class members. Damages, however, may depend on a variety of circumstances. *See, e.g.*, *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003). Thus, the issue is whether damages and liability can appropriately be bifurcated. Put differently, must the case be susceptible to both imposing liability and awarding damages on a class-wide basis?

Plaintiff's position is that the two issues can be bifurcated, writing: "Liability is often determined in a class action context separately from damages — be it at summary judgment or through a trial where liability is bifurcated from damages." Pl.'s Resp. to Def.'s Mem. on Permissible Exceptions 2.

As the law presently stands, Plaintiff is correct that "many courts, including the Sixth Circuit, have held that variations in potential damages awards will not defeat class certification." *Laichev v. JBM, Inc*., 269 F.R.D. 633, 641–42 (S.D. Ohio 2008) (citing *Olden v. LaFarge Corp.*, 383 F.3d 495, 508–09 (6th Cir. 2004); *Bentley v. Honeywell Intern., Inc.,* 223 F.R.D. 471, 487 (S.D. Ohio 2004)).

In *Olden v. LaFarge Corp.*, 203 F.R.D. 254 (E.D. Mich. 2001), *aff'd* 383 F.3d 495 (6th Cir. 2004), the district court certified a class of "property owners in the City of Alpena, Michigan

who claim that their real and personal property have been damaged by toxic pollutants and air contaminants emitted by the defendant during the course of its cement manufacturing operation." *Id*. at 258.  Rejecting the defendant's argument that certification was not appropriate "because of the great variance in damages sought by the named class members," the district court explained that the issue of liability from the issue of damages is properly bifurcated in appropriate circumstances.  *Id*. at 269, 271 (citing *Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236, 267 (E.D. Mich. 1997)).

The Sixth Circuit affirmed the judgment, explaining: "As the district court properly noted, it can bifurcate the issue of liability from the issue of damages, and if liability is found, the issue of damages can be decided by a special master or by another method."  383 F.3d at 509 (citing Fed. R. Civ. P. 23(c)(4)(A); *Simon v. Philip Morris Inc.*, 200 F.R.D. 21, 30 (E.D.N.Y. 2001)); *see generally Carnegie v. Household Int'l, Inc*., 376 F.3d 656, 661 (7th Cir. 2004) ("Rule 23 allows district courts to devise imaginative solutions to problems created by the presence in a class action litigation of individual damages issues.  Those solutions include (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class."  (internal quotation marks omitted)).

While this is the current state of the law, which this Court is obligated to follow, as noted the Supreme Court has granted a writ of certiorari on the following question: "Whether a district court may certify a class action without resolving whether the plaintiff class has introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding

damages on a class-wide basis."  *Behrend v. Comcast Corp.*, 655 F.3d 182 (3d Cir. 2011), *cert. granted sub nom. Comcast Corp. v. Behrend*, 80 U.S.L.W. 3442 (U.S. Jun 25, 2012) (No. 11-864).

In *Behrend*, an antitrust class action, a proposed class of two million cable television subscribers in Philadelphia alleged that a cable television company violated the Sherman Act by conspiring with other cable companies to allocate, and thus concentrate, local market share by entering into unlawful "swap agreements."  655 F.3d at 186 (citing 15 U.S.C. §§ 1, 2). Specifically, the plaintiffs alleged that "Comcast contracted with competing cable providers to either acquire them or to 'swap' cable systems it owned in areas outside the Philadelphia [market] for cable systems within the Philadelphia [market]."  *Id.*  By gaining monopoly power, the plaintiffs alleged, Comcast was able to overcharge its customers.  The district court certified the class, finding in pertinent part that the plaintiffs' "damages model provides a methodology that can establish damages on a class-wide basis using common proof."  *Id.* at 203.  Third Circuit affirmed the judgment of the district court, explaining:

> If allowed to proceed to trial, the class must establish that the injury it suffered from the violation of the antitrust laws is measurable. . . .  The inquiry for a district court at the class certification stage is whether the plaintiffs have demonstrated by a preponderance of the evidence that they will be able to measure damages on a class-wide basis using common proof.  Some variation of damages among class members does not defeat certification.  Complex and individual questions of damages, however, weigh against finding predominance.

*Id.* at 203, 204 (internal citations omitted) (citing *In re Hydrogen Peroxide Antitrust Litigation*, 552 F.3d 305 (3d Cir. 2008)).  The court then found that the plaintiffs established they could measure damages through common proof, writing that the defendant's "attacks on the merits of the methodology . . . have no place in the class certification inquiry."  *Id.* at 207.

Comcast petitioned the Supreme Court for a writ of certiorari. As noted, the writ has been granted to determine: "Whether a district court may certify a class action without resolving whether the plaintiff class has introduced admissible evidence, including expert testimony, to show that the case is susceptible to awarding damages on a class-wide basis." 80 U.S.L.W. 3442.

It is possible, of course, that the Court will answer this question in the negative. *See generally* Judith Resnik, *A Comment on AT&T v. Conception, Wal-Mart v. Dukes, and Turner v. Rodgers*, 125 Harv. L. Rev. 78, 134–153 (2011). It is also possible that the Court will limit its holding to antitrust litigation. *But compare Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) (applying "plausibility" pleading standard to antitrust claim), *with Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions.' "). Prior to a decision, however, this Court is bound by the Sixth Circuit precedent, under which liability may be bifurcated from the damages. The Court will certify Class II.

**3**

Finally, the parties have informally agreed to defer resolution of Class III. Plaintiff therefore has not identified how many persons are in the class, what the commonality is between the claims, or why these commonalities predominate. The Court declines to certify Class III at present.

**B**

Having certified Classes I and II, the next issue is the scope of the default. "The effect of a default is to deem admitted all the well-pleaded facts in the complaint." 49 C.J.S. *Judgments* § 273 (2012). Consequently, as a general matter, and as applied to class actions in particular, by defaulting a defendant "has foregone its right to challenge any of the well-pleaded factual

allegations in Plaintiff's complaint." *Davis v. Precise Comm'n Servs., Inc*., No. 1:07–CV–3128–JOF, 2009 WL 812276, at *1 (N.D. Ga. Mar. 27, 2009) (citing *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1976)).

While a default admits well-pleaded facts, it does not admit legal conclusions. "That is, a default does not admit that the facts alleged are in law sufficient to constitute a good cause of action or to entitle the plaintiff to the relief prayed for. Thus, although a defaulting party admits the factual basis of the claims asserted against it, the defaulting party does not admit the legal sufficiency of those claims." 49 C.J.S. *Judgments* § 273 (footnote omitted) (citing *State ex rel. Saginaw Prosecuting Attorney v. Bobenal Investments, Inc*., 314 N.W.2d 512 (Mich. Ct. App. 1981)).

Accordingly, the factual allegations in the complaint are deemed admitted for the entire class. Nevertheless, default is only proper to Class I and II if the factual allegations state claims on which relief can be granted.

### 1

The Class I claim alleges that being detained overnight or for more than sixteen hours without bedding alleges a cognizable constitutional injury. For the following reasons, the Court will order supplemental briefing on this allegation.

"In evaluating the constitutionality of conditions or restrictions of pretrial detention," the Supreme Court instructs, "we think that the proper inquiry is whether those conditions amount to punishment of the detainee." *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). The Court explains that the Due Process Clause requires that "a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. A person lawfully committed to pretrial detention has not been adjudged guilty of any crime." *Id*. (internal citations omitted) (citing *Ingraham v.*

*Wright*, 430 U.S. 651, 671-72 n.40, 674 (1977); *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165-67 (1963); *Wong Wing v. United States*, 163 U.S. 228, 237 (1896)).

"Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense," the Court cautions. *Bell*, 441 U.S. at 537. For example, "Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility. And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'" *Id*. Therefore a court must draw "a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may." *Id*.

Put differently, the Court must determine whether the conditions of incarceration serve a "legitimate governmental objective" or are punitive. *Thompson v. City of L.A.*, 885 F.2d 1439, 1448 (9th Cir. 1989), *overruled on other grounds by Bull v. City and County of S.F.*, 595 F.3d 964 (9th Cir. 2010) (en banc) (holding "that the rights of arrestees placed in custodial housing with the general jail population are not violated by a policy or practice of strip searching each one of them as part of the booking process").

In *Anela v. City of Wildwood*, 790 F.2d 1063, 1064 (3d Cir. 1986), for example, the Third Circuit held that confining arrestees "through the night until almost noon of the next day without drinking water, food, or sleeping facilities . . . constituted privation and punishment in violation of the fourteenth amendment." *Id*. at 1069. Likewise, in *Thompson*, the Ninth Circuit held that that confining arrestee without "a bed or even a mattress for two of the nights spent in county jail . . . constitutes a cognizable Fourteenth Amendment claim" because it serves no legitimate governmental objective. 885 F.2d at 1448 (collecting cases). And in *Lareau v. Manson*, 651

F.2d 96,(2d Cir.1981) the Second Circuit held that use of floor mattresses for pretrial detainees violated the Fourteenth Amendment when it was "without regard to the number of days for which a prisoner is so confined." *Id*. at 105.

Based on these authorities, detention overnight without any bedding materials is sufficient to state a constitutional injury. It is not obvious, however, that detention for sixteen hours is sufficient. It may be that sixteen hours is insufficient, but that twenty is, or that twenty hours is insufficient, but that twenty-four is. Supplemental briefing on this issue will be ordered.

### 2

The Class II claim asserts that Defendant is liable under *Monell* for "an ingrained and long standing" practice of detaining arrestees for more than forty-eight hours without a judicial determination of probable cause. To demonstrate municipal-liability under an "inaction theory," the Sixth Circuit explains, the plaintiff must establish four elements:

> (1) the existence of a clear and persistent pattern of violating federal rights[;] . . .
> (2)  notice or constructive notice on the part of defendants;
> (3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and
> (4) that the defendants' custom was the "moving force," or direct causal link for the constitutional deprivation.

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996)).

"Deliberate indifference in this context," the Sixth Circuit emphasizes, "does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference." *Doe*, 103 F.3d at 507.

In *Powers*, for example, the plaintiff sought to impose § 1983 municipal-liability on the public defender's office under an "inaction theory." 501 F.3d at 607. The Sixth Circuit first

noted that "[a] municipality cannot be liable for the constitutional torts of its employees; that is, it cannot be liable on a *respondeat superior* theory." *Id.* at 607 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). Instead, the municipality is only liable if "the plaintiff establishes that the municipality engaged in a 'policy or custom' that was the 'moving force' behind the deprivation of the plaintiff's rights." *Id.* Pertinent to that case (and this), the Sixth Circuit continued: "A § 1983 plaintiff may establish the existence of a custom by showing that policymaking officials knew about and acquiesced in the practice at issue." *Id.* (citing *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004)). As the plaintiff was proceeding under an "inaction theory," the court then enumerated the four elements set forth above. The court concluded by finding that the plaintiff had established three of the four elements, but that a genuine issue of fact existed as to the third element — whether the defendant's conduct (more precisely, their lack of conduct[3]) was so deliberately indifferent as to amount to an official policy of inaction.

In this case, supplemental briefing will be directed to this element as well. Specifically, the parties will be directed to focus attention on the legal authority regarding whether the factual allegations in the complaint "show a 'clear and persistent pattern' of abuse that the Defendants knew about and acquiesced in." *Powers*, 501 F.3d at 616.

### III

Accordingly, it is **ORDERED** that Plaintiff's motion for class certification (ECF No. 32) **GRANTED IN PART AND DENIED IN PART**. Classes I and II are certified; Class III is not.

---

[3] *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 132 S. Ct. 2566, 2589 (2012) (Roberts, C.J.) ("To an economist, perhaps, there is no difference between activity and inactivity; both have measurable economic effects on commerce. But the distinction between doing something and doing nothing would not have been lost on the Framers, who were "practical statesmen," not metaphysical philosophers.").

It is further **ORDERED** that supplemental briefing be provided addressing: (1) whether detention for sixteen hours without any bedding materials is sufficient to state a constitutional injury; and (2) whether the factual allegations in the complaint are sufficient to state a claim under an "inaction theory."  Plaintiff's brief is due on or before October 25, 2012.  Defendant's response is due on or before November 8, 2012.  Plaintiff's reply is due on or before November 15, 2012.

Dated: September 27, 2012

<div style="margin-left:40%">

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

</div>

<div style="border:1px solid black; padding:10px">

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 27, 2012.

s/Tracy A. Jacobs
TRACY A. JACOBS

</div>