UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

JONATHAN BROWN,

                 Plaintiff,

v.                                         Case Number 10-12162
                                         Honorable Thomas L. Ludington
CITY OF DETROIT,

                 Defendant.
_____/

**OPINION AND ORDER PARTIALLY DECERTIFYING CLASS I
AND ENTERING LIABILITY AGAINST DEFENDANT FOR CLASSES I AND II**

Plaintiff Jonathan Aaron Brown was arrested without a warrant on September 21, 2007 in the city of Detroit. He claims that he was mistreated while in custody. Specifically, he claims that was held for about 60 hours. During this time, he was not provided a mattress. He was not provided a probable cause hearing before a neutral magistrate. And he was not provided two meals a day (much less three).

Asserting that Defendant City of Detroit routinely treats arrestees this way, Plaintiff filed suit on behalf of himself and thousands of others. The complaint alleges that Defendant violates the constitutional rights of arrestees in three distinct ways. First, Defendant does not provide mattresses or other bedding to arrestees held 16 hours or more over the course of single day or overnight. Second, Defendant routinely detains arrestees for more than forty-eight hours without a judicial determination of probable cause. And third, Defendant does not feed arrestees at least two meals a day. Plaintiff estimates the size of Class I is about 108,000. The size of Class II is about 30,000. And the size of Class III, Plaintiff acknowledges, has not been determined.

Plaintiff filed suit in June 2010.  Defendant answered.  Plaintiff then sought discovery, which Defendant did not produce.  An order compelling production was entered.  Still Defendant did not produce the information.  A second order compelling production was entered.  It cautioned that non-compliance would result in sanctions.  Yet again Defendant did not produce the information.  Plaintiff then moved for sanctions.

The Court, noting that there had been nine months of unexplained agreements to produce documents followed by neglect by Defendant, granted Plaintiff's motion and entered a default against Defendant.  ECF No. 27.  In entering the order, the Court emphasized that Defendant repeatedly missed discovery deadlines agreed to by the parties and ignored the Court's orders.  Indeed, by the time the Court entered the default, Defendant had stopped speaking to Plaintiff's attorneys, responding to Plaintiff's written inquiries, and appearing for Court-ordered hearings.

Plaintiff then moved for class certification.  Granting the motion in part in September 2012, the Court issued an opinion and order certifying the first two classes (but not the third).  *Brown v. City of Detroit*, 10-12162, 2012 WL 4470433 (E.D. Mich. Sept. 27, 2012).  In the same opinion and order, the Court also concluded that default runs to the two classes.  But the Court cautioned that while being in default means that Defendant admits the complaint's well-pleaded factual allegations, it does not mean that Defendant admits the complaint's legal conclusions.  Accordingly, before deciding Defendant's liability, the Court directed the parties to brief the legal issues pertinent to the first two classes.  The supplemental briefing has been received.

In Plaintiff's papers, he first asserts that detaining an arrestee for 16 hours (but not overnight) without providing the arrestee a mattress is unconstitutional.  Next, Plaintiff asserts that detaining an arrestee overnight without providing him a mattress is unconstitutional.  And third, Plaintiff asserts that Defendant had actual notice of a "clear and persistent pattern" of

detaining persons arrested without a warrant for more than 48 hours such that Defendant's deliberate "indifference in failing to act translates to a policy of inaction."

Defendant responds that arrestees do not have a right to mattresses, and, even if they do, withholding the mattresses is necessary to "guard against suicide risks." Moreover, Defendant asserts, it was not deliberately indifferent to the protracted detentions. Acknowledging that some arrestees were "negligently handled," Defendant asserts that these were no more than a "small trickle" within the "constant flood of detainees" that Defendant processed during the relevant period.

For reasons detailed below, Plaintiff's first assertion does not have merit, but his second and third do. Neither of Defendant's assertions have merit.

Briefly, it is beyond dispute that "federal courts have found that forcing a pretrial detainee to sleep without a mattress, or on the floor on a mattress, for even a short period of time, constitutes a violation of the Fourteenth Amendment." *Oladipupo v. Austin*, 104 F. Supp. 2d 626, 639 (W.D. La. 2000) (collecting cases). The issue is how short a period of time is sufficient to state a viable claim? Is it after eight hours of confinement? Sixteen? Twenty-four?

Often, line-drawing is best left to legislatures, not courts. *Cf. Hutto v. Davis*, 454 U.S. 370, 374 (1982) (discussing line-drawing in Eighth Amendment context); *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 330 (2006) (discussing institutional competencies of courts and legislatures).[1]

And several states have taken up the task in this very context. California, for example has promulgated a regulation providing that "facilities which hold persons longer than 12 hours"

---

[1] As one commentator observes, "the ideal of reasoned development of durable principles requires the Court to eschew essentially eclectic judgments, to intervene sparingly unless it can articulate the values it finds enduring at a level of generality and with a degree of absoluteness that avoids conflict between the judiciary and the legislature in appraising particular conditions." Archibald Cox, *The Role of Congress in Constitutional Determinations*, 40 Cin. L. Rev. 199, 221 (1971).

must provide arrestees "one serviceable mattress," "one mattress cover or one sheet," and "one blanket or more depending upon climatic conditions."  Cal. Code Regs. tit. 15, § 1270, *cited in* Pl.'s Supp. Br. 4 n.1.  Ohio has promulgated a similar regulation.  *See* Ohio Admin. Code 5120:1-7-02; 5120:1-10-01(12), *cited in* Pl.'s Supp. Br. 4 n.1.  It provides: "Prisoners confined for more than eight hours shall be: (a) Assigned a bed; [and] (b) Provided with a clean mattress, blanket, bed linens and towels."  Ohio Admin. Code 5120:1-10-01(12) (formatting omitted).

In drawing these lines, of course, the states were setting up a regulatory framework above the constitutional floor.  Neither the State of Michigan nor Defendant, however, have done so.  Consequently, determining the minimum level of treatment beneath which an arrestee may not be held under falls to this Court.  More particularly, the Court must pinpoint where the constitutional floor is to determine when an arrestee has the right to not sleep on the literal floor.

The Sixth Circuit has not had occasion to address this specific issue.  But several other federal courts of appeal have.  *E.g.*, *Thompson v. City of L.A.*, 885 F.2d 1439, 1442 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cnty. of S.F.*, 595 F.3d 964 (9th Cir. 2010); *Lyons v. Powell*, 838 F.2d 28, 31 (1st Cir. 1988); *Anela v. City of Wildwood*, 790 F.2d 1063, 1070 (3d Cir. 1986); *Lareau v. Manson*, 651 F.2d 96, 105 (2d Cir. 1981).

As detailed below, these decisions instruct that the constitution, among its protections, does not mandate that arrestees detained over the course of a single day (but not held overnight) be provided a mattress.  But the constitution does, in general, require that an arrestee be given one if he is held "overnight,"[2] absent a legitimate, non-punitive reason to withhold it.  Because Defendant does not demonstrate how withholding mattresses is rationally related to a legitimate governmental objective, it is liable to those arrestees held overnight.

---

[2] Neither the reported cases nor the parties in this case have attempted to define "overnight."

The constitution also requires that a municipality which has actual notice of a clear and persistent pattern of constitutional violations by its agents act to correct the problem.  Not doing so constitutes deliberate indifference, for which a municipality is liable.  Here, Defendant did not mishandle a "small trickle" of arrestees — but a steady stream.  Class II is comprised of about 30,000 people — roughly 20 percent of the total arrestees during the relevant period.  Defendant had actual notice of the problem for more than a decade.  Not correcting it constitutes deliberate indifference.

Accordingly, Class I will be amended to include only those arrestees detained "overnight."  (Although it is not immediately obvious what precise period of time "overnight" refers to, neither party asserts that the term is ambiguous.  Rather, both refer to "overnight" as a working — and workable — definition of a distinct subclass.)  As amended, Defendant will be found liable to Class I.  Defendant will also be found liable to Class II.

Having concluded the liability phase of the case, a status conference will be scheduled to discuss the next phase.  Damages.  And in preparation for that conference, the parties will be directed to brief their proposed manners of establishing damages.

## II

"The effect of a default is to deem admitted all the well-pleaded facts in the complaint." 49 C.J.S. *Judgments* § 273 (2012).  Accordingly, in determining whether Defendant is liable the following factual allegations in the complaint are assumed to be true.

### A

The Detroit Police Department "has a long history of detaining persons in excess of 48 hours without a judicial probable cause determination."  Compl. ¶ 44(c), ECF No. 1.  The practice has existed "for decades."  *Id.* ¶ 2.

In Detroit, arrestees "are held in small, bare cells, approximately eight feet in length and six feet in width." *Id*. ¶ 18. The cells "contain only a concrete [slab]. There is no bed or bunk to sleep on and the cells are kept very cold." *Id*. ¶ 19. Likewise, the cells do not contain mattresses or other bedding. *Id*. ¶ 21(b). Indeed, the Detroit Police Department "maintains no bedding in its facilities." *Id*.

## B

More than a decade ago, the United States Department of Justice Civil Rights Division (DOJ) began an investigation into the Detroit Police Department's practices. Compl. ¶ 44(c).[3]

As a result of the DOJ investigation, in 2003 a consent decree was entered. *See id*. ¶¶ 8, 15, 44. Under the consent decree, Defendant "admitted that these same prolonged detentions and same conditions of confinement violate the constitutional rights of detainees in the [police department's] custody." *Id*. ¶ 8. Defendant further "agreed to arraign detainees within 24 hours, and to document the specific reasons for any delay when it fails to meet that requirement." *Id*. ¶ 15. A "consent decree monitor" was also appointed. Compl. ¶ 15.

A decade has passed since the consent decree was entered. Defendant's practices have not significantly improved.

## C

Rather, "[d]etentions in excess of 48 hours [remain] an ingrained and long standing [Detroit Police Department] practice." *Id*. ¶ 44(e).

For example, "the sample data obtained by the consent decree monitor indicates that during the reporting periods in 2008 and 2009, between 18 and 34 percent of arrestees were

---

[3] "In addition to the DOJ inquiry . . . numerous individual cases as well as criminal cases dating back to 1998 and before have challenged that the [police department] fails to obtain probable cause determinations within 48 hours of arrest." *Id*. ¶ 44(d).

detained in excess of 48 hours by the [department] without a judicial determination of probable cause." *Id*. ¶ 44(f).

At present, the consent decree monitor "continues to report significant numbers of detentions in excess of 48 hours without a probable cause determination." *Id*. ¶ 44(e).

This pattern is not a secret. "Periodic reports of the consent decree monitor, relevant media stories, and numerous criminal and individual civil cases, have all put Detroit's policymakers on notice that the unlawful policies and pattern of constitutional violations has continued." Compl. ¶ 44(e).

Additionally, notwithstanding the consent decree, the police department continues to maintain no bedding in its facilities. *Id*. ¶ 21(b).

## D

Plaintiff's case typifies these violations. He is a resident of Gratiot County. On September 21, 2007, Plaintiff was arrested without a warrant by Detroit police officers. *Id*. ¶ 27. (The complaint does not specify what Plaintiff was arrested for.)

After arriving at the police station, "detectives booked Mr. Brown and placed him in a small, cold, isolated room. There was no place to sit but on concrete and there was no place to sleep; he was not even provided a mattress, blanket, or pillow." *Id*. ¶ 28.

Plaintiff remained in that room for the next 55 hours. *Id*. ¶ 29. During this time, "his repeated requests for a phone call, an attorney, and information about what he was being charged with, were all denied." *Id*.

Eventually, the detectives moved Plaintiff — but not to a probable cause hearing before a neutral magistrate. Compl. ¶ 31. Rather, Plaintiff was transported to a different cell in a different police station. *See id*. "This one was filled with trash, dirt, and feces." *Id*. ¶ 32.

On the evening of September 23 — about 60 hours after Plaintiff was arrested without a warrant — the detectives interviewed Plaintiff. *Id.* ¶ 34. Plaintiff later "succumbed to the [police] detectives' tactics and gave a coerced statement." *Id.* (What happened to Plaintiff after that is not specified in the complaint.)

**E**

On June 1, 2010, Plaintiff filed a civil rights complaint in the United States District Court for the Eastern District of Michigan. Because Plaintiff is a Gratiot County resident, pursuant to Local Rule 83.10 the case was assigned to this Court. *See* E.D. Mich. L.R. 83.10.

Plaintiff's complaint seeks certification for three classes of persons. The proposed Class I is defined as "All persons detained in a [Detroit Police Department] lock-up or detective division facility overnight or for more than sixteen hours in a 24-hour period at any time from May 27, 2007 to the present." Compl. ¶ 38. The complaint contends that these arrestees were subjected to "inhumane conditions of confinement" since Defendant "maintains no bedding and no facilities to allow arrestees to get meaningful sleep, i.e., no beds, cots, mattresses, blankets or pillows." *Id.* ¶ 38(d).

The proposed Class II is defined as "All persons detained by the [Detroit Police Department] in excess of 48 hours without a judicial determination of probable cause at anytime from May 27, 2007 until the present." Compl. ¶ 43.

And the proposed Class III is defined as "All persons detained by the [City of Detroit Police Department] in excess of 24 hours [who] did not receive at least two meals at any time from May 27, 2007 to the present." *Id.* ¶ 50.

**F**

Defendant was served and timely answered in June 2010. ECF Nos. 10, 11. In August 2010, the Court entered a scheduling order setting deadlines for discovery and dispositive motions and scheduling pretrial conference and trial dates. ECF No. 13.

Plaintiff then sought discovery from Defendant, requesting a database of all persons arrested by the Detroit Police Department during the proposed class period. Defendant responded by producing a four-page document regarding Plaintiff's arrest. Nothing else. So Plaintiff filed a motion to compel in September 2010. ECF No. 14. In October 2010, the Court granted Plaintiff's motion. ECF No. 18.

Still, Defendant did not respond to the discovery requests. In November 2010, Plaintiff moved to enforce the order granting Plaintiff's motion to compel. ECF No. 19. A stipulated order was entered granting Plaintiff's motion in December 2010. ECF No. 24. The order cautioned: "Defendant's failure to comply with this order will result in sanctions."

Again, Defendant did not produce the discovery as ordered. In March 2011, Plaintiff moved for sanctions. ECF No. 25. Plaintiff wrote: "Since January 25, 2011, Plaintiff has written four letters and left three messages urging [Defendant] to comply with the Order[s]. These pleas have gone ignored. There is nothing more that Plaintiff can do but seek default judgment."

Defendant did not file a response to Plaintiff's motion for sanctions.

A hearing on Plaintiff's motion was scheduled for April 14, 2011. The hearing was held. Defendant did not appear.

On April 18, 2011, the Court granted Plaintiff's motion. ECF No. 27. In entering the order, the Court emphasized that there had been nine months of unexplained agreements to produce voluminous documents followed by neglect and inattention by Defendant. Defendant

had not only repeatedly missed discovery deadlines agreed to by the parties, but also ignored the Court's orders. Indeed, by the time the Court entered the default, Defendant had stopped speaking to Plaintiff's attorneys, responding to Plaintiff's written inquiries, and appearing for Court-ordered hearings.

## G

In November 2011, a status conference was held. Shortly before the conference, Plaintiff submitted a status report on the potential size of the three proposed classes. ECF No. 53. Plaintiff specified that he found:

- For Class I, Defendant's databases contained "107,609 records where an individual was detained between 10 p.m. and 6 a.m. or for more than 16 hours."

- For Class II, Defendant's databases showed "there were 37,064 arrests which lead to detentions longer than 48 hours. . . . Of the 37,064 arrests where the length of detention exceeded 48 hours, 79.4% were warrantless arrests. The estimated size for Class II is 29,431."

- For Class III, Defendant did not maintain an electronic record, and so Plaintiff had not yet determined the size of the potential class. Plaintiff explained: "The meal logs are only available in paper format and have not been data entered electronically yet. As such, this analysis is limited to the length of detention criteria and the estimated class size is overly inclusive. With that understanding, the LiveScan database identifies 83,808 records where an arrestee was detained over 24 hours."

Pl.'s Report on Potential Size of Class 2, 3, 4–5, ECF No. 53. Plaintiff also elaborated regarding Defendant's affirmative defenses to Class II. Plaintiff first noted that the warrant tracking form database ("the only evidence the [police department] maintains as to why an individual did not get to see a judge for more than 48 hours after arrest") contained 4,173 records. *Id*. at 3. After reviewing 30 percent of these records, Plaintiff extrapolated that for the potential class of about 30,000 "there are likely to be only 200 records at issue." *Id*. at 4.

## H

In February 2012, another status conference was held.  Plaintiff again submitted a status report on the potential size of the proposed classes.  ECF No. 55.  Plaintiff explained that he had had significantly overestimated the number of Class II members for whom Defendant had an affirmative defense.  "After reviewing the relevant records from the Warrant Tracking Form database," Plaintiff elaborated, "[he] identified a total of 110 records which fit in one of Defendant's affirmative defenses."   Pl.'s Report on Number of Individuals Affected by Affirmative Defenses 2, ECF No. 55.

Following the status conference, an order was entered directing supplemental briefing on Plaintiff's pending motion for class certification and entry of default in favor of the class.  The parties then submitted supplemental briefing on two issues: (1) whether class certification was appropriate; and (2) the scope of Defendant's default.  ECF Nos. 57–59.

In September 2012, the Court issued an opinion and order certifying the first two classes. ECF No. 60.  The Court also, as noted, concluded the default extends to these classes.  The Court explained that as a general matter, and as applied to class actions in particular, by defaulting a defendant "has foregone its right to challenge any of the well-pleaded factual allegations in Plaintiff's complaint."   *Davis v. Precise Comm'n Servs.*, *Inc.,* No. 1:07–CV–3128–JOF, 2009 WL 812276, at *1 (N.D. Ga. Mar.27, 2009) (citing *Nishimatsu Constr. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir.1976)).  Put differently, a defendant in default is deemed to have "admitted all the well-pleaded facts in the complaint." 49 C.J.S. *Judgments* § 273 (2012).

But while a default admits well-pleaded facts, it does not admit legal conclusions. "That is, a default does not admit that the facts alleged are in law sufficient to constitute a good cause of action or to entitle the plaintiff to the relief prayed for.  Thus, although a defaulting party

admits the factual basis of the claims asserted against it, the defaulting party does not admit the legal sufficiency of those claims." *Id.* (footnote omitted) (citing *State v. Bobenal Invs., Inc.*, 314 N.W.2d 512 (Mich. Ct. App. 1981)).

Accordingly, the Court directed supplemental briefing on liability. Specifically, the Court directed the parties to brief the legal issues pertinent to the first two classes. The parties have done so. ECF Nos. 61, 63–64.

### III

### A

The parties agree that regardless of how long the Detroit Police Department detains an arrestee — one hour, 16 hours, overnight, or longer (in Plaintiff's case, about 60 hours) — the department does not provide mattresses.

The dispute concerns when, if ever, this condition of confinement becomes a constitutional violation.

### 1

As a threshold matter, the constitutional standards regarding conditions of confinement depend on how far the "machinery of criminal justice"[4] has moved in a particular case.

### a

In the beginning — when a person has been arrested without a warrant and not yet received a probable cause determination by a neutral magistrate — the person's conditions of confinement are governed by the Fourth Amendment's "reasonableness" standard. *Aldini v. Johnson*, 609 F.3d 858, 866 (6th Cir. 2010). The Sixth Circuit explains that "because the Fourth Amendment controls the permissible duration of warrantless, post-arrest, pre-arraignment custody, it must also apply to evaluate the condition of such custody." *Id.* (quotation marks and

---

[4] *Ballard v. United States*, 329 U.S. 187, 201 (1946) (Frankfurter, J., dissenting).

emphasis omitted) (quoting *Pierce v. Multnomah Cnty., Or.*, 76 F.3d 1032, 1043 (9th Cir. 1996)).

And, as the Supreme Court emphasizes, "the ultimate touchstone of the Fourth Amendment is reasonableness." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006) (quotation marks omitted) (collecting cases). Thus, for this sort of warrantless arrestee the court must evaluate whether the challenged condition is "objectively reasonable." *Id.*

**b**

Further along — if a person has been arrested pursuant to a warrant or has been "taken before a magistrate judge, or other judicial official, to determine whether the arrest and continued detention were based on probable cause" — the Fourth Amendment no longer applies. *Aldini*, 609 F.3d at 867 n.7 (quoting *Barrie v. Grand Cnty.*, 119 F.3d 862, 866 (10th Cir. 1997)).

Instead, the conditions of confinement are governed by the less stringent Due Process Clause of the Fourteenth Amendment. *See generally Guzinski v. Hasselbach*, 920 F. Supp. 762, 769 n.8 (E.D. Mich. 1996) ("[T]he Fourth Amendment 'reasonableness' standard provides greater protection to individuals from excessive government actions than does the Fourteenth Amendment."); *cf.* Bradley M. Campbell, Comment, *Excessive Force Claims: Removing the Double Standard*, 53 U. Chi. L. Rev. 1369, 1382 (1986) (observing in excessive force context that the Fourth Amendment offers greater protection than Fourteenth Amendment).

The Fourteenth Amendment simply "requires that a pretrial detainee not be punished." *Bell v. Wolfish*, 441 U.S. 520, 537 n.16 (1979). The Supreme Court explains:

> A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest. . . . Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the

detention facility so long as those conditions and restrictions do not amount to punishment.

*Bell*, 441 U.S. at 536–37 (quotation marks and brackets omitted) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 114 (1975)) (citing *Virginia v. Paul*, 148 U.S. 107, 119 (1893)).   Whether a condition amounts to punishment, the Court further instructs, depends on whether it is "reasonably related to a legitimate goal."  *Bell*, 441 U.S. at 539.  Specifically:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."  Conversely, if a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

*Id*.  The court may also infer that the purpose of the governmental action is punishment when an ostensibly legitimate goal is achieved by unnecessarily harsh methods.  *Id*. at 539 n.20.  For example,

> [L]oading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial and preserve the security of the institution.  But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so many alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish.

*Id*.  At the other end of the spectrum of severity, however, the Court cautions: "There is, of course, a *de minimis* level of imposition with which the Constitution is not concerned."  *Bell*, 441 U.S. at 539 n.21 (quoting *Ingraham v. Wright*, 430 U.S. 651, 674 (1977)).

**c**

Finally, after a person has been tried, convicted, and sentenced, he "may be punished, although that punishment may not be 'cruel and unusual' under the Eighth Amendment."  *Bell*, 441 U.S. at 537 n.16.

**d**

Here, as noted, Class I is made up of about one hundred thousand arrestees detained sixteen hours or more or overnight.  Some were arrested with a warrant; some were not.  None, however, received a mattress.

**2**

As detailed below, "federal courts have found that forcing a pretrial detainee to sleep without a mattress, or on the floor on a mattress, for even a short period of time, constitutes a violation of the Fourteenth Amendment."  *Oladipupo v. Austin*, 104 F. Supp. 2d 626, 639 (W.D. La. 2000) (collecting cases).  The issue, as noted, is how short a period of time is a constitutional violation?

The Sixth Circuit has not had occasion to address the question.  But several other federal courts of appeal have.  Before turning to those decisions, however, the caution of Chief Justice John Marshall merits repeating: "we must never forget that it is a *constitution* we are expounding."  *M'Culloch v. Maryland*, 17 U.S. 316, 407 (1819) (emphasis in original).

**a**

The Ninth Circuit, for one, has concluded that overnight detention without a mattress constitutes a violation of the Fourteenth Amendment.  *Thompson v. City of L.A.*, 885 F.2d 1439, 1442 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cnty. of S.F.*, 595 F.3d 964 (9th Cir. 2010).  Specifically, the court found that the plaintiff stated a Fourteenth Amendment claim by alleging that "the County failed to provide him with a bed or even a mattress for two of the nights spent in county jail and that consequently he was forced to sleep on the cement floor during those nights."  *Thompson*, 885 F.2d at 1448.  The court noted that "basic concepts of

decency, as well as reasonable respect for constitutional rights, require that [the person] be provided a bed." *Id.* at 1448 (quoting *Stewart v. Gates*, 450 F. Supp. 583, 588 (C.D. Cal. 1978)).

In accord, the Third Circuit concluded that not providing mattresses to arrestees "confined in jail cells through the night until almost noon of the next day . . . constitute[s] privation and punishment in violation of the fourteenth amendment." *Anela v. City of Wildwood*, 790 F.2d 1063, 1070 (3d Cir. 1986).

Likewise, the Second Circuit found that requiring a pretrial detainee sleep on the floor on a mattress "constitute[s] punishment without regard to the number of days for which a prisoner is so confined." *Lareau v. Manson*, 651 F.2d 96, 105 (2d Cir. 1981). Specifically, the court concluded:

> [D]ouble-bunked cells and overloaded dayrooms at the [correctional facility] would be constitutionally permissible for presumptively innocent detainees for a maximum of 15 days, by which time they would become unacceptable punishment in violation of the Fourteenth Amendment. The 15-day period might be exceeded by two or three days when it is certain that the detainee would be released within that time. However, since the conditions would even then subject pretrial detainees to severe hardships before the expiration of that maximum period, every effort should be made to further shorten the 15-day period of double-bunking of such inmates. The use of the fishtank,[5] floor mattresses and medical unit practices,[6] however, are too egregious to warrant any such leeway. They constitute punishment without regard to the number of days for which a prisoner is so confined.

651 F.2d at 105.

And finally, the First Circuit observed that requiring a pretrial detainee sleep on the floor overnight, even with a mattress, may violate the constitution, explaining:

---

[5] The "fishtank," the court explained, was an "all-purpose dayroom" that had been converted "into a dormitory. Dubbed the 'fishtank' because of its glass walls, it has housed as many as 9 men. When so filled, inmates had to crawl over one another to reach the single toilet provided to them." 651 F.2d at 99–100.

[6] The court explained that the medical unit cells, "though not designed for general housing of even single inmates, [were] double-bunked. Indeed, healthy inmates were sometimes doubled-up and confined for 23 out of 24 hours in a day with physically ill or psychiatrically ill cellmates." 651 F.2d at 100.

-16-

> We are persuaded by the rulings of our sister circuits that subjecting pretrial detainees to the use of a floor mattress for anything other than brief emergency circumstances may constitute an impermissible imposition of punishment, thereby violating the due process rights of such detainees. Naturally, whether the use of floor mattresses amounts to punishment must be viewed in light of whether such a practice causes the detainee "to endure genuine privations and hardship."

*Lyons v. Powell*, 838 F.2d 28, 31 (1st Cir. 1988) (quoting *Bell*, 441 U.S. at 542); *see Brown v. Crawford*, 906 F.2d 667, 672 (11th Cir. 1990) ("[A]ll inmates are issued mattresses or beds . . . . There is no evidence of complaints concerning sleeping on the floor without a mattress by any inmate."); *but see Collins v. Ainsworth*, 382 F.3d 529, 545 (5th Cir. 2004)).

To summarize, the above authorities (among others) hold that an arrestee being detained overnight without a mattress violates the Fourteenth Amendment, absent a showing that the deprivation of the mattress is reasonably related to a legitimate governmental objective.

Yet none of the authorities hold that arrestees detained over the course of a single day, but not overnight, must be given a mattress. Indeed, an independent review reveals no federal appellate decision recognizing such a constitutional right.[7]

And while a nap may be pleasant, no reported decision has concluded that depriving an arrestee a mattress during ordinary waking hours causes them "to endure genuine privations and hardship" that the constitution prohibits. Rather, this condition of confinement is reasonable.

---

[7] Federal district courts do not appear to have recognized such a right either. *Cf. Quint v. Dunaj*, 3:02CV2053(AVC)(TPS), 2006 WL 167563, at *5 (D. Conn. Jan. 20, 2006) ("Quint contends that defendants Dunaj and Moore subjected him to unconstitutional conditions of confinement when they placed him in a cell for eight hours without a mattress, blanket or sheets. Research has revealed no cases finding a constitutional violation where an arrestee was not provided a mattress and bedding for such a short period."); *Lynch v. Hunter*, CIV. A. 00-CV-1331, 2000 WL 1286396, at *7 (E.D. Pa. Sept. 1, 2000) ("Plaintiff was confined for twelve hours, and was not detained overnight. While she may have found the conditions of her detention uncomfortable, or even intolerable, given the relatively brief duration of her confinement, the Court finds that she has failed to state a claim."); *Proudfoot v. Chenger*, CIV. A. 89-4290, 1990 WL 156605, at *4 (E.D. Pa. Oct. 3, 1990) ("Even though the City of Coatesville did not then feed prisoners brought to the lockup by other jurisdictions, and has never provided prisoners with a mattress, blanket or drinking water, in view of the fact that plaintiff spent only twelve hours in the lockup, the conditions of plaintiff's confinement did not amount to punishment.").

Thus, regardless of which standard is applied to the claims of those detained over the course of a single day but not overnight, Defendant's conduct does not violate the constitution.

In contrast, whether the claims of those detained overnight are evaluated under the more protective Fourth Amendment standard or less protective Fourteenth, Defendant's conduct violates the constitution — unless Defendant can show that it is reasonably related to a legitimate governmental objective. And this Defendant does not do.

**b**

In Defendant's papers, it writes that withholding mattresses is necessary to "guard against suicide risks and hazards in holding cells." Def.'s Supp. Br. 3. Defendant elaborates that such a measure is necessary because the consent decree requires "protecting detainees from themselves" and ensuring that "holding cells are free of any potential suicide hazards." *Id*. at 4. Defendant's argument lacks merit.

Although suicide prevention and detainee safety are legitimate interests, Defendant does not explain how its depriving arrestees of mattresses is rationally related to those interests. For example, Defendant does not explain (nor is it obvious) how mattresses designed for detention facilities increase the risk of suicide. Nor is it obvious what other hazards, if any, these types of mattresses pose. As Plaintiff observes,

> [T]here are many manufacturing companies dedicated to producing bedding products for detention facilities. The mattresses produced by these companies are specially designed and treated to address law enforcement safety concerns. Detention mattress features include: fire resistance, radio frequency sealed seams (no stitches), crack- and tear-resistance, and anti-microbial properties. These mattresses are used by law enforcement agencies nationwide and do not contain metal or other parts that would give detainees the opportunity to use them as weapons.

Pl.'s Supp. Reply 3, ECF No. 64 (citations omitted). Because Defendant has not shown that withholding mattresses from arrestees held overnight is reasonably related to a legitimate

-18-

governmental objective, this deprivation violates the Fourteenth Amendment.   Defendant is liable to these persons.

**c**

Federal Rule of Civil Procedure 23(c)(1)(C) provides: "An order that grants or denies class certification may be altered or amended before final judgment."   Under this rule, "The district judge must define, redefine, subclass, and decertify as appropriate."   *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983), *cited in* 7AA Charles Alan Wright et al., *Federal Practice & Procedure* § 1785.4 n.1 (3d ed. 2004); *see also* 3 William B. Rubenstein et al., *Newberg on Class Actions* § 7:47 (4th ed. Supp.2010) ("Because class rulings may be altered or amended at any time before a decision on the merits, class rulings are often reconsidered, and subsequently affirmed, altered, modified, or withdrawn.").

Here, Class I will be amended to include only those arrestees detained overnight without a mattress, while excluding  arrestees detained for 16 hours or more (but not overnight).

As noted, although it is not immediately obvious what precise period of time "overnight" refers to, neither party asserts that the term is ambiguous.  Rather, both refer to "overnight" as a working — and workable — definition of a distinct group of persons.

Defendant will therefore be found liable to the amended Class I.

**2**

Class II asserts that Defendant is liable for "an ingrained and long standing" practice of detaining arrestees for more than forty-eight hours without a judicial determination of probable cause.  To demonstrate municipal-liability under this type of "inaction theory," the Sixth Circuit explains, the plaintiff must establish four elements:

(1) the existence of a clear and persistent pattern of violating federal rights[;] . . .
(2) notice or constructive notice on the part of defendants;

(3) the defendants' tacit approval of the unconstitutional conduct, such that their deliberate indifference in failing to act can be said to amount to an official policy of inaction; and

(4) that the defendants' custom was the "moving force," or direct causal link for the constitutional deprivation.

*Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 607 (6th Cir. 2007) (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996)).

**a**

The first element Plaintiff must establish, as noted, is "the existence of a clear and persistent pattern of violating federal rights." *Powers*, 501 F.3d at 607.

Here, the Detroit Police Department "has a long history of detaining persons in excess of 48 hours without a judicial probable cause determination." Compl. ¶ 44(c).[8]  The practice has existed "for decades." *Id.* ¶ 2.

In 2003, a consent decree was entered with the DOJ.  *See id.* ¶¶ 8, 15, 44.  Under the consent decree, Defendant "admitted that these same prolonged detentions and same conditions of confinement violate the constitutional rights of detainees in the [police department's] custody." *Id.* ¶ 8.

A decade has passed since the consent decree was entered.  Yet things have not improved.  Rather, "[d]etentions in excess of 48 hours [remain] an ingrained and long standing [Detroit Police Department] practice." Compl.¶ 44(e).  For example, "the sample data obtained by the consent decree monitor indicates that during the reporting periods in 2008 and 2009, between 18 and 34 percent of arrestees were detained in excess of 48 hours by the [department] without a judicial determination of probable cause." *Id.* ¶ 44(f).  At present, the consent decree

---

[8] "The effect of a default," as noted, "is to deem admitted all the well-pleaded facts in the complaint." 49 C.J.S. *Judgments* § 273 (2012).

monitor "continues to report significant numbers of detentions in excess of 48 hours without a probable cause determination." *Id.* ¶ 44(e).

The factual allegations in the complaint satisfy the first element of an inaction theory claim.

### b

The second element is "notice or constructive notice on the part of defendants." *Powers*, 501 F.3d at 607.

Here, Defendant was on actual notice of the violations. It signed a consent decree admitting the violations in 2003. Compl. ¶ 8. Since then, it has been repeatedly informed that things have not improved. *Id.* ¶ 44(e). "Periodic reports of the consent decree monitor, relevant media stories, and numerous criminal and individual civil cases, have all put Detroit's policymakers on notice that the unlawful policies and pattern of constitutional violations has continued." *Id.*

The factual allegations in the complaint satisfy the second element.

### c

The third element is "deliberate indifference." *Powers*, 501 F.3d at 607. The Sixth Circuit emphasizes that deliberate indifference "does not mean a collection of sloppy, or even reckless, oversights; it means evidence showing an obvious, deliberate indifference." *Doe*, 103 F.3d at 507. This can be established by showing that the defendant "knew or should have known" of the violation and "failed to investigate [it] and punish those responsible, in effect ratifying their actions." *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989).

Here, accepting the factual allegations in the complaint as true, Defendant's acts demonstrate this type of obvious, deliberate indifference. For more than a decade, Defendant

was on actual notice of the significant numbers of detentions in excess of 48 hours without a probable cause determination. By not curtailing these violations and punishing those responsible, Defendant effectively ratified their actions.

The factual allegations in the complaint satisfy the third element.

### d

The fourth and final element is causation — that Defendant's inaction was the "moving force" for the constitutional deprivation. *Powers*, 501 F.3d at 607. "At bottom," the Sixth Circuit explains, "this is a causation inquiry, requiring the plaintiff to show that it was the defendant's custom or policy that led to the complained of injury." *Id.* at 608 (citing *Garner v. Memphis Police Dept.*, 8 F.3d 358, 363–64 (6th Cir. 1993)).

Causation has two prongs: cause in fact and proximate cause. *Powers*, 501 F.3d at 608–09. "Cause in fact is typically assessed using the 'but for' test, which requires us to imagine whether the harm would have occurred if the defendant had behaved other than it did." *Id.* at 608 (citing David W. Robertson, *The Common Sense of Cause in Fact*, 75 Tex. L. Rev. 1765, 1768–69 (1997)). Proximate cause, in turn, is assessed as "a matter of foreseeability, asking whether it was reasonably foreseeable that the complained of harm would befall the § 1983 plaintiff as a result of the defendant's conduct." *Powers*, 501 F.3d at 609.

Here, factual allegations in the complaint satisfy both types of causation. But for Defendant's deliberate indifference to the violations, significant numbers of arrestees would not have had to wait more than 48 hours for a probable cause determination. *Cf.* Pl.'s Report on Number of Individuals Affected by Affirmative Defenses 2 (noting that of the 29,431 warrantless arrestees during the relevant period, there were a mere 110 potentially subject to an affirmative defense).

And, as noted, Detroit Police Department "has a long history of detaining persons in excess of 48 hours without a judicial probable cause determination." Compl. ¶ 44(c). The practice has existed "for decades." *Id*. ¶ 2. Under the circumstances, Defendant's deliberate indifference to this conduct made it reasonably foreseeable that the conduct would continue.

The factual allegations in the complaint establish an inaction theory claim. Defendant is liable to Class II.

**e**

Against this conclusion, Defendant tersely asserts: "Plaintiff's proofs (partial sampling of [police] records) fall short with respect to the strict standards elaborated above in all of the above four requirements. Where a constant flood of detainees is handled by the department and a small trickle of a minority of same are negligently handled there is no municipal liability." Def.'s Supp. Br. 9, ECF No. 63.

Contrary to Defendant's contention, it did not mishandle a "small trickle" of arrestees — but a steady stream. As noted, Class II is comprised of about 30,000 people — roughly 20 percent of the total arrestees during the relevant period.[9]

**IV**

Accordingly, it is **ORDERED** that Class I is **AMENDED** to include only those arrestees detained overnight (thus excluding those arrestees detained for sixteen hours over the course of a day).

It is further **ORDERED** that the firm of Loevy & Loevy is **APPOINTED** as counsel for Classes I and II.

---

[9] From June 1, 2007 to July 31, 2011, the Detroit Police Department made 142,143 arrests. Of the 37,064 arrests where the length of detention exceeded 48 hours, 79.4 percent were warrantless arrests. After excluding the 100 for which an affirmative defense applies, the estimated size for Class II is 29,300.

It is further **ORDERED** that Defendant is found **LIABLE** to the amended Class I and to Class II.

It is further **ORDERED** that counsel for the parties appear for a status conference before the Honorable Thomas L. Ludington, at U.S. Courthouse, 1000 Washington Avenue, Bay City, Michigan, on **March 21, 2013, at 3:00 pm**.  Plaintiff is directed to file a supplemental brief outlining his proposed manner of establishing damages on or before **March 8, 2013**.  Defendant is directed to file a brief responding to Plaintiff's proposal on or before **March 15, 2013**.

s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

Dated: February 27, 2013

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 27, 2013.

s/Tracy A. Jacobs
TRACY A. JACOBS

---